UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| BRIAN KENDRICK, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )    Cause: 3:22-CV-673-DRL-MGG |
| | ) |
| DORELL BASS and LANRE IDOWU, | ) |
| | ) |
|     Defendants. | ) |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to N.D. Ind. Local Rule 56-1(a)(3), Defendants Dorrell Bass and Lanre Idowu herewith submit the following Statement of Material Facts in Support of their Motion for Summary Judgment:

1. Defendants' Exhibit A is an affidavit executed by Pamela James, Litigation Liaison at Indiana State Prison ("ISP") in Michigan City, Indiana. Ms. James was the ISP Litigation Liaison at all times relevant to Mr. Kendrick's complaint.

2. Plaintiff, Brian Kendrick (DOC# 197155), is an individual who was incarcerated at ISP in December 2021. [ECF 12-2 at p. 9].

3. Defendant Lanre Idowu is a correctional officer employed by the Indiana Department of Correction at Indiana State Prison. He was a correctional officer at all times relevant to Mr. Kendrick's complaint. [Exhibit B at ¶¶1, 3].

4. Defendant Dorrell Bass is a former Sergeant. In December 2021, he was employed by the Indiana Department of Correction at Indiana State Prison. [Exhibit C at ¶1].

5. Officer Idowu and former Sergeant Bass have no medical training or experience. [Ex. B at ¶ 2; Ex. C at ¶ 2].

1

6. As a Correctional Officer, Officer Idowu is typically assigned to a cell house. On December 17, 2021, he was assigned to cell house A north. [Ex. B at ¶ 3].

7. On December 17, 2021, Officer Idowu and Sergeant Bass saw a fire coming out of cell A-108 North at approximately 12:10 a.m. [Ex. B at ¶ 4; Ex. C at ¶ 3].

8. Plaintiff Brian Kendrick resided in A-536 North, which is four floors above the fire and fourteen cells down from the fire. Mr. Kendrick was not directly above the fire. [Ex. A at ¶¶ 3, 5; Ex. A-1].

9. Officer Idowu was in the officer station with Sergeant Bass and Officer Gbjumo when he saw the fire. A signal 10-71 was called and Officer Idowu immediately proceeded to cell A-108. [Ex. B at ¶ 5].

10. Sergeant Bass immediately attempted to put the fire out with a fire extinguisher before first responders arrived. [Ex. C at ¶ 4].

11. First responders and firefighters arrived at the scene at approximately 12:11 a.m. [Ex. B at ¶ 6].

12. A signal 3000 was called at 12:12 a.m. for James Griffith, the incarcerated person residing in cell A-108. [Ex. B at ¶ 7].

13. Mr. Griffith barricaded his door with a mattress and had a chain connected to a padlock on his cell door. Sergeant Bass requested bolt cutters and Officer Page used bolt cutters to access the cell. First responders removed Mr. Griffith, who was unresponsive. [Ex. B at ¶ 8; Ex. C at ¶ 5].

14. The fire was extinguished by approximately 12:17 a.m. [Ex. B at ¶ 9].

15. The fire never spread beyond Mr. Griffith's cell A-108. [Ex. B at ¶ 10; Ex. C at ¶ 7].

16. Because the fire was confined to cell A-108, ISP employees did not evacuate A cell house. [Ex. B at ¶ 11; Ex. C at ¶ 7].

17. Sergeant Bass and Officer Page entered the cell to remove Mr. Griffith, who was unresponsive. Sergeant Bass placed Mr. Griffith in restraints and he was then placed on a gurney. [Ex. C at ¶ 6].

18. An ambulance arrived at 12:24 a.m. and Nurse Gorski cleared the signal 3000 at 12:26 a.m. A trip team took Mr. Griffith to the hospital. [Ex. B at ¶ 12; Ex. C, at ¶ 6].

19. Gray smoke rose directly above cell A-108. [Ex. A-2].

20. First responders retrieved fans to clear the cell house of smoke, in addition to the exhaust fans that were already in the unit. [Ex. B at ¶ 13].

21. Sergeant Bass instructed his officers to perform wellness checks on all floors to ensure that all incarcerated persons were conscious and not in immediate distress. [Ex. C at ¶ 8].

22. Officer Idowu conducted a wellness check of incarcerated individuals in A cell house. As he is not a medical professional, his goal in the wellness checks was to ensure that no incarcerated persons were in any immediate distress. [Ex. B at ¶ 14].

23. Sergeant Bass did not conduct wellness checks on the fifth floor. Sergeant Bass did not go to the fifth floor on December 17, 2021. [Ex. B at ¶ 15; Ex. C at ¶ 13].

24. When Officer Idowu went by cell A-536, Mr. Kendrick spoke to him. Mr. Kendrick was conscious, he was breathing, and he did not appear to be in any immediate distress. [Ex. B at ¶ 16].

25. Mr. Kendrick, along with other inmates, requested to see medical. This is the only communication Officer Idowu had with Mr. Kendrick. [Ex. B at ¶ 17].

26. Mr. Kendrick understood that Officer Idowu does not provide medical care. [Ex.

D, p. 80 lines 12-14].

27. To the best of Sergeant Bass's knowledge, he has never spoken to Mr. Kendrick. [Ex. C at ¶ 13].

28. Mr. Kendrick did not speak to Sgt. Bass on December 17, 2021. Mr. Kendrick has never spoken with Sgt. Bass. Mr. Kendrick has no knowledge of what Sgt. Bass did during the fire, except that he was working that night. [Ex. D, p. 23 lines 8-21].

29. Officers returned with a list of individuals who wanted medical treatment, which was given to medical. [Ex. C at ¶ 9].

30. Mr. Kendrick wrote a medical request that night. This is the only request he made for medical care before his appointment on January 11, 2022. [Ex. D, p. 24 lines 11-12; Ex. D p. 80 lines 7-9].

31. Officer Idowu informed medical of Mr. Kendrick's request, as well as the requests of other incarcerated persons who asked to see medical. [Ex. B at ¶ 18]

32. Nurse Gorske did not request an ambulance for any incarcerated person, aside from Mr. Griffith. [Ex. C at ¶ 10].

33. Nurse Gorske did not administer any breathing treatments. However, many people requested to see medical on a non-emergent basis. Sergeant Bass relied on the medical staff to determine who needed care most urgently. [Ex. C at ¶ 11].

34. As Officer Idowu is not a medical professional, he relies on ISP's medical team to assess individuals and provide medical care. He further relies on ISP's medical team to make triage decisions regarding which incarcerated persons need treatment more urgently. [Ex. B at ¶ 18].

35. A-Cell House Staff, offender firefighters, and response team followed facility protocol of extinguishing the fire, removing the incarcerated individual from his cell in a timely

manner, and conducting a wellness check on all ranges. [Ex. A-3, p. 1].

36. On January 11, 2022, Mr. Kendrick presented to medical for a sick visit. Tanya Hoadley, RN, pertinently documented that his temperature was 99 and his pulse oximetry at rest was 97%. On exam, he had wheezing and his lungs were not clear to auscultation. Nurse Practitioner Diane Thews ordered an albuterol inhaler, chest x-ray, and prednisone. [Ex. A-4, pp. 1-3].

37. On January 21, 2022, Mr. Kendrick returned to medical. On physical exam, Mr. Kendrick's lungs were clear to auscultation. Nurse Hoadley found that his respirations were even and unlabored. X-ray results revealed that he had no acute cardiopulmonary abnormality. Mr. Kendrick reported that his inhaler occasionally caused a burning feeling and requested a refill of Prednisone. Nurse Hoadley referred him to the medical provider. [Ex. A-4, pp.5-6].

38. On January 25, 2022, Mr. Kendrick returned to medical and Nurse Practitioner Thews assessed him. On review of systems, NP Thews documented that Mr. Kendrick had some wheezing but had no cough, dyspnea, painful respiration, or chest pain. At rest, his pulse oximetry was 90%. On physical exam, NP Thews found that Mr. Kendrick was obese and his auscultation and breathing effort were normal. NP Thews also reviewed his chest x-ray results and advised him that he had no acute cardiopulmonary abnormality. She prescribed an additional course of prednisone and advised him to continue his albuterol inhaler as needed. [Ex. A-4, pp. 7-9].

39. On February 24, 2022, Mr. Kendrick returned to medical for a nurse visit. Nurse Sherri Fritter documented that his resting pulse oximetry was 99%. She cleared him for kitchen duty. [Ex. A-4, pp. 11-12].

40. On February 24, 2022, Nurse Fritter documented that Mr. Kendrick had "no disability. Offender is capable of performing activities of daily living." Nurse Fritter, along with

5

Nurse Practitioner Thews, also documented that Mr. Kendrick was "free of illness or injury; free of physical impairment." When updating his classification, Nurse Fritter indicated that Mr. Kendrick did not have any chronic medical conditions. [Ex. A-4, pp. 10, 14, 15].

41.  On April 9, 2022, Mr. Kendrick returned to medical with complaints of a productive cough and complaints that he "can't bench 300 pounds when he is 'winded.'" His pulse oximetry at rest was 97%. He weighed 270 pounds with a BMI of 36.61. On exam, NP Thews found that his breathing effort and auscultation were normal. NP Thews recommended weight reduction and deep breathing exercises. [Ex. A-4, pp. 18-20].

42.  On April 13, 2022, Mr. Kendrick presented to his psychotherapy appointment with Angelica Smith. Mr. Kendrick reported that he had nightmares and got approximately 5 hours of sleep each night. Ms. Smith observed "significant narcissistic [personality disorder] traits" and found that anxiety and depression were not significant. Aside from the narcissistic traits, Ms. Smith did not document any mental health diagnoses. [Ex. A-4, pp. 21-23].

43.  On June 24, 2022, Mr. Kendrick presented to Dr. Nancy Marthakis for a medical visit. Mr. Kendrick reported "trouble breathing some days worse than others" and asked for a refill of his inhaler. His pulse oximetry at rest was 98%. On physical exam, Mr. Kendrick had normal auscultation and breathing effort. Dr. Marthakis did not diagnose him with any conditions and her impression was that "[l]ung fields sound good today, issued one time inhaler." [Ex. A-4, pp. 24-25].

44.  On August 3, 2022, Mr. Kendrick did not attend the sick call he scheduled for his alleged breathing problems. [Ex. A-4, p. 29].

45.  On September 29, 2022, Mr. Kendrick presented to Nurse Practitioner Karen Fagan with complaints of breathing problems and dyspnea. Mr. Kendrick requested a refill of his inhaler.

On review of systems, Mr. Kendrick did not have any cough or chest pain. On physical exam, Mr. Kendrick had normal auscultation and breathing effort. He had no shortness of breath at rest or on exertion. His peak flow was 325, and NP Fagan found "No indication for inhaler". She ordered a follow up chest x-ray.  [Ex. A-4, pp. 31-32].

46. On October 24, 2022, Mr. Kendrick returned to NP Fagan. His chest x-ray was normal. His peak flows were 350, 390, and 340. He reported dyspnea and wheezing. His pulse oximetry at rest was 98%. On exam, NP Fagan found mild wheezing with normal breathing effort. NP Fagan reordered his albuterol inhaler. [Ex. A-4, pp. 34-36].

47. Mr. Kendrick has no medical training or experience. [Ex. D, p. 79 lines 2-7].

                Respectfully submitted,

                **EICHHORN & EICHHORN, LLP**

                /s/*Allison E. Pulliam*
                One of the Attorneys for Defendants,
                Dorell Bass and Lanre Idowu

David J. Beach, # 18531-45
Allison E. Pulliam, #36232-45
EICHHORN & EICHHORN, LLP
2929 Carlson Drive, Suite 100
Hammond, IN 46323
Telephone: (219) 931-0560
dbeach@eichhorn-law.com
apulliam@eichhorn-law.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2023, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Allison E. Pulliam